# BALTIMORE CITY COURT.

Filed July 12, 1928.

PENTECOSTAL ORPHANAGE, ETC.,
VS.
STATE BOARD OF STATE AID AND
CHARITIES, ETC.

*Murray MacNabb* for Pentecostal Orphanage, etc.

*Thomas H. Robinson, Attorney-General*, and *John Hubner Rice, Assistant Attorney-General*, for State Board of State Aid and Charities, etc.

STANTON, J.—

This is an appeal from the refusal of the Board of State Aid and Charities to grant a license to the Pentecostal Orphanage under Section 5A of Chapter 632 of the Acts of 1927.

The testimony is voluminous, and need not be reviewed in detail. The action of the Board of State Aid and Charities in refusing to grant the license is based on the unfavorable report of Samuel E. Shanahan, its president, and William J. Ogden, its secretary, concerning the condition of the children and the attendants at the Pentecostal Orphanage. The foundation for the report was one visit to the orphanage by these two officers on February 6th, 1928, covering the period from about 1 o'clock to 3.30 or 4 o'clock in the afternoon.

The only children they saw were about six to ten in number, and all or most of whom were under school age. The children who were old enough were out of the orphanage attending school. The president of the board and the secretary looked over the building, made inquiry about the finances

and the administration, and do not complain particularly about any of these features except the manner of keeping the books. But so far as the president is concerned, he was moved to report unfavorably because of the pathetic appearance of the children, all of whom he says were poorly clad, some having sores on their faces, they looked underfed, and appeared to be cared for inadequately.

Underfed children are not peculiar to an orphanage. Only as late as June 22nd, 1928, the press carried a report of the nation-wide researches by the United States Children's Bureau, wherein it is said that nearly one-third of the children in this country are undernourished. But the doctor's examination of these children on February 21st, shows only a limited number, perhaps two or three, to be under weight. The idea that the children were underfed is probably due not only to their appearance, but Mr. Shanahan was there about lunch time, and saw some bread and molasses on the table.

Dr. Moser, a physician, who was in the orphanage perhaps more often than any other of the doctors who have testified, says that he has seen children in the institution have sores on their faces, but usually it was a child who had just been admitted, and after the ordinary period for healing, the sores would clear up, and the condition of the child would improve from every standpoint. He further testified that the living conditions were entirely satisfactory, and the food was wholesome and the care of the children adequate.

Mr. Ogden, the secretary, testifies to the same conditions as did Mr. Shanahan but adds the additional fact that he made an effort to locate some of the trustees or managers, whose names appeared on the literature of the institution, by examining the city directory and telephone lists, but could not find their names. However, Mr. Gerlack, of the Henry Watson Children's Aid Society, as late as June 11th, 1928, located six who were residents of this city, and two of those whom he could not locate appeared in Court, and testified at the hearing.

What occasioned this visit to this institution by these officials when none of the boarding homes in the State have been visited as yet, is not explained by them, unless it is in the statement of the secretary that he had access to the files of a community fund official which contained unfavorable reports about the institution. But as a result of any personal effort on his part, he knows absolutely nothing further than what he saw on the visit hereinbefore referred to. And neither of them has been in the institution since that first visit. But the secretary says in his testimony in this case that so far as the housing conditions and cleanliness of the home are concerned, he had no complaint, but that the institution had the appearance of great need, bordering on poverty (its gross income for 1927 was $12,144.84). and did not conform to the standards which had been set up and promulgated by the board.

Prior to the Act of 1927, the Board of State Aid and Charities did not have any supervision over this institution because it did not apply for, nor did it receive, any State aid. In order to set up some standards for institutions which had for the first time been brought under the supervision of the board by the Act of 1927, certain rules and regulations were adopted. Just when does not appear. The law became effective June 1st, 1927. But as nearly as Mr. Ogden can recall, copies of these regulations were mailed about, or shortly after, December 15th, 1927. Mr. Houck, the superintendent of the orphanage, testifies that he did not receive his copy until early in January.

### RULES AND REGULATIONS.

*Governing Boarding Houses or Institutions Having the Care, Custody or Control of Two or More Minors.*

That all corporations or individuals having the care of such children as come under the provisions of Chapter 632 of the Acts of 1927, shall have the premises occupied by them for the care of children inspected annually by the State Board of Health or by its duly constituted local inspector as to the condition of the plumbing, heating and general sanitary arrangements, and also cause said premises to be inspected as to their protection against the hazards of fire.

That such institutions or individuals shall keep records which will fully and accurately disclose:

1. The number of children being cared for in the institution or home.

2. The date and place of birth of each child.

3. The names and addresses of the parents.

4. The circumstances under which each child is received.

5. The number of children placed out by the institution or individual.

6. The name and address of the family or agency with whom or with which the children have been placed.

7. If the applicant is an institution, the financial condition of the institution, the statements to disclose the amount of money received and the sources from which received and the expenditures of money for the maintenance and support of the institution. If a private home, the amount received as board from parents or guardians or other persons, and all other sources of funds used to maintain the home.

That said form shall be sent out before December 31, 1927, and thereafter on or before December 15th of each year.

That the applicants for licenses shall be requested to fill out said forms on or before January 31, 1928, and thereafter on or before January 15th, of each year and file same with the Secretary of the Board of State Aid and Charities of the State of Maryland at once.

These rules and regulations did not begin to operate until January of 1928, and no judgment could be based on the failure of this orphanage to comply with these rules and regulations, until a reasonable period, or perhaps the full year of 1928, had elapsed. So far as the evidence in this case discloses the requirements of the rules and regulations were fully met as to the number of children; date and place of birth; names and addresses of parents; the circumstances under which the child was received, the number of children placed out in homes; the names and addresses of the family with whom the children were placed; and these records were offered in evidence. The only subject of criticism was the manner of keeping the books showing the sources of receipts, and expenditures. The report of the special committee which is in evidence does not set forth a single complaint about any of these matters.

Notwithstanding the requirements set up by the Board in which nothing is said about medical supervision, three physicians and two or three nurses from the Baltimore City Health Department, without any notice to, or request from, Mr. Houck, appeared at the orphanage on February 21st, 1928, and made a physical examination of the children. The reports are in evidence and disclose the usual stock complaints which are more or less general about children; some had adenoids, and some had bad tonsils, one or two with scabies.

Upon the submission of the report of this examination the Board of State Aid and Charities on March 20th, 1928, refused to issue the license, and sent a letter of Mr. Houck under that date notifying him accordingly.

Whatever the details of these reports, and however convincing they may have been to the members of the board—all of the doctors from the Health Department testify that the condition of the health of the children was what they would call fair, and about the average. And one of these physicians declared herself as decidedly opposed to orphanages. The children had been examined at the children's clinic of the University of Maryland Hospital monthly, with a few lapses—one time for a period of two months, when the children were quarantined, because of the prevalence of measles in Baltimore City. They always had medical attention when any were sick, many times being attended by Dr. Ferry, one of the visiting physicians at the University clinic, as well as other physicians.

Dr. Imhoff, an inspector from the Health Department of Baltimore City, is the only representative of that department who visited this institution with any regularity. His visits were due to the fact that the orphanage was in his district. He speaks of the difficulty he had in obtaining compliance with sanitary standards which he would dictate. He says that on one occasion about *two years or more past*, he saw some cabbage which was unwholesome, and some frost-bitten potatoes, all of which he thought were to be used for food, but does not know that they were used, and the evidence of Mr. Houck and others connected with the conduct of the institution, and the cooking of the food, deny that

any such vegetables were on the premises, or that they were ever used.

Dr. Warthen, another physician in the Health Department of Baltimore City, had supervision of the sanitary requirements of the institution. He laid out the sleeping space in the bedrooms, and advised, if, indeed he did not order, the equipment and dispensary supplies for an alleged Dr. Pelletier, who lived in the institution two months or more, claiming to have been the representative of the Health Department as medical supervisor. Dr. Warthen appears to have had no thought, prior to February 21st, 1928, that the institution was not a reasonably satisfactory place for these children. He does not even say so in this case, but when he was called upon by Mr. Ogden to make the examination of February 21st, he and his staff did something they had never done before, and for which under the law, they do not seem to have had any warrant.

If they were going to take on the medical and physical supervision of these institutions, why had it not been done prior to February 21st, rather than insist that some supervising physician should be in attendance, or that they go to the clinic. The reason for all of this effort on the part of the Board of State Aid and Charities appears to have been to lay some foundation for its contemplated action. When the facts set forth as the basis for the refusal of the license are weighed against the evidence of those who have known the institution for varying periods from five or ten years, with opportunity to observe the children, and the upkeep and conduct of the home; and in more recent times the observations of Miss Lloyd, the nurse at the University Clinic, Prof. Fadely, of the Millersville Agricultural High School, and Miss Wohlgemuth, the Anne Arundel County health nurse; the Rev. Charles W. Baldwin, and others who have been in the institution, no other conclusion is left on the facts but that the action of the Board was unreasonable and arbitrary, especially is this true when the management of the orphanage requested a hearing in their letter of March 22nd, 1928, as was their right, but their request was ignored.

Article 88A, of the Code of Public General Laws, creates and defines the powers and duties of the Board of State Aid and Charities.

Section 5 of that Article reads as follows: "To enable the Board of State Aid and Charities to properly discharge the duties imposed upon it by this law, the said Board may of its own motion, or by the direction of the Governor shall cause charges to be formulated against any corporation, association, institution or agency receiving financial assistance from the State or with which the State has contracts, and cause a copy of such charges to be served on such corporation, association, institution or agency, and shall have power to issue summons for witnesses * * * and administer oaths and take testimony which it shall cause to be transcribed and included in its report." It also has the power to visit and inspect the management, buildings and equipment of any institutions which receive State aid, and as a result of any action taken by the Board the right of appeal is given to any Court of General Common Law jurisdiction, which when done, requires the Court to fully investigate the subject matter of the appeal, and decide all questions of law and fact arising in connection therewith and affirm, reverse or modify the action of the Board in the premises. etc.

The Act of 1927, Chap. 632, in Section 5A, which is intended to immediately follow Section 5, of Article 88A, and which must be read in conjunction with Section 5, provides:

* * * "The said Board shall have the same power to investigate and visit any such institution, agencies, societies or individuals as is now provided by law in the case of corporations, associations, institutions or agencies receiving financial assistance from the State or having contracts with the State, and shall have power to revoke the licenses of any such institution, agencies, societies or individuals. All such action of the Board is subject to the same right of appeal by any party who shall feel aggrieved at any action of the Board hereunder, as in the case of State aided institutions," etc.

It is apparent that before any action can be taken by the Board of State Aid and Charities to deprive any orphanage receiving State aid, of any of its rights and privileges, charges must be formulated, and a hearing

held, with the right of appeal to a court of law if the managing authorities feel aggrieved at the action of the Board.

Section 5A, of the Act of 1927, is intended to extend and does extend this same requirement to those institutions which have been brought under the supervision of the Board of State Aid and Charities by the Act of 1927, even though they do not receive any State aid. Otherwise there would be nothing on which the appeal, which is expressly provided for in the Act of 1927, could operate, and any action looking to revoking or denying any license is illegal unless it conforms to these requirements. No charges have been formulated and no hearing was held in the matter now before the Court. For these reasons the action of the Board is not only unreasonable and arbitrary, but the action of the Board is also illegal.

In this case the least consideration that could have been extended to this institution, which had only received the State regulations late in December, 1927, or early in January, 1928, was an opportunity to those who were directing its affairs to show whether they would comply with the State requirements, but this was denied without a hearing, and without any warning of what was to be expected.

The orphanage has expended money for personal property, furniture, bedding, medical supplies and remodeling real estate, to adapt it to its use. If the action of the Board of State Aid is approved and allowed to stand this orphanage is arbitrarily stripped of its work, and its property made practically valueless, without any complaint being formulated and hearing held as the foundation for the action taken.

Much stress has been laid on the method by which the institution obtains some of its funds for operating expenses. This method is to employ people to solicit money on the streets in Baltimore City. These solicitors receive a commission on the amount collected. This method is not in accord with modern organized charity, but other organizations, as well as individuals, are now doing the same thing. It is probably annoying to those who are approached, but no one is compelled to contribute.

If it is unauthorized or illegal it can be stopped by those whose duty it is to control such matters. But if it is authorized, there is no reason why the files of any agency of organized charity should be the source of inspiration or the motivating cause to stop street solicitation, by crushing out this institution.

This orphanage may not grade Class A. There are probably many things which can be criticized in its operation. It depends entirely on voluntary contributions for its support, and is thereby limited in its funds. It has never applied for State aid and does not now. But with all of this, and whatever other shortcomings there may be, there is no reason why it should not receive the same consideration that any other similar institution receiving State aid would be according under the provisions of the law creating and controlling the Board of State Aid and Charities. It was never notified wherein it had failed to meet the rules and regulations of the Board of State Aid. It was never afforded an opportunity to attempt to comply with them. It was never given a hearing to justify its work.

Under the evidence in this record the application should be granted, and the license should be issued for the year 1928.

For the foregoing reasons, an order will be signed reversing the action of the Board of State Aid and Charities as is provided in Section 5, of Article 88A, of the Code of Public General Laws. The costs of this appeal, including the transcribing of the stenographic record, to be paid by the Board of State Aid and Charities.